**United States District Court**
For the Northern District of California

1
2
3
4
5
6                          UNITED STATES DISTRICT COURT

7                         NORTHERN DISTRICT OF CALIFORNIA

8
9
10
11
     EDGARDO LOYOLA,                              No. C 09-0575 PJH
12
               Plaintiff,                         **ORDER GRANTING DEFENDANT'S**
13                                                **MOTION FOR SUMMARY JUDGMENT,**
          v.                                      **DENYING PLAINTIFF'S MOTION FOR**
14                                                **SUMMARY JUDGMENT, AND DENYING**
     JOHN E. POTTER,                              **DEFENDANT'S MOTION TO STRIKE**
15                                                **PLAINTIFF'S MOTION FOR SUMMARY**
               Defendant.                         **JUDGMENT**
16   _____/

17        Defendant's motion for summary judgment came on for hearing before this court on

18   April 7, 2010.  Plaintiff Edgardo Loyola appeared in propria persona, and defendant John E.

19   Potter, Postmaster General of the United States, appeared by Assistant United States

20   Attorney Jennifer S. Wang.  Also before the court is plaintiff's motion for summary

21   judgment, and defendant's motion to strike plaintiff's motion as untimely.  Having read the

22   parties' papers and carefully considered their arguments and the relevant legal authority,

23   and good cause appearing, the court hereby GRANTS defendant's motion for summary

24   judgment, DENIES plaintiff's motion for summary judgment, and DENIES defendant's

25   motion to strike plaintiff's motion.

26                               **BACKGROUND**

27        This is an employment case, alleging claims of discrimination and harassment based

28   on gender and age, under Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S.C.

§ 2000e-2,[1] and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623. Plaintiff Edgardo Loyola is a male over the age of 40.  He was hired as a transitional city carrier for the Alameda Post Office, in Alameda, California, on September 4, 2007.

Under the National Agreement between the National Association of Letter Carriers and the Postal Service ("the Agreement"), Postal Service employees are classified as "regular" (which includes full-time and part-time employees) and "transitional" (non-career, bargaining unit employees).

Transitional carriers fill in for and assist regular city carriers on their mail delivery routes.  A transitional carrier may be assigned to fill in for a regular carrier when he/she is unavailable, or may be assigned a route that is temporarily without a regular carrier.  In addition, transitional carriers may be asked to help separate outgoing mail, after they have returned from their delivery routes.  The assignments given to transitional carriers vary depending on the needs of the particular post office.  Thus, they may be assigned to a different route each day.

The Agreement provides further that all new carriers, including transitional employees, must serve a probationary period of 90 days.  The purpose of the probationary period is to provide the Postal Service with an opportunity to assess an employee's performance and conduct, and weed out poor performers before the end of the probationary period.  The Postal Service may terminate a probationary employee for any nondiscriminatory reason, and those probationary employees are not permitted to utilize the grievance procedure set forth in the Agreement.

Under the Agreement in effect at the time of plaintiff's employment, transitional employees received a term appointment. Those appointments were renewable, but each appointment was limited to a maximum of 360 days.

Plaintiff commenced employment as a transitional carrier at the Alameda Post Office on the same day as two other transitional carriers – Alex Tong and Silvanna Pak.  Plaintiff,

---

[1]  As defendant is a federal employer, the Title VII claim is brought under 42 U.S.C. § 2000e-16.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   Mr. Tong, and Ms. Pak were given approximately two weeks of training at the beginning of

2   their probationary periods, at the Postal Service's Processing and Distribution Center

3   ("P&DC") in Oakland, California.  Following that training, they were given additional training

4   at the Alameda Post Office.  They started delivering mail around September 20 or 21,

5   2007.

6          Two additional transitional carriers – Marc Bartolome and Adoracion Zapanta-Mato –

7   commenced employment at the Alameda Post Office on October 1, 2007.[2]  At the

8   beginning of their probationary periods, Mr. Bartolome and Ms. Zapanta-Mato also received

9   two weeks' training at the Oakland P&DC, before reporting to the Alameda Post Office.

10  They started delivering mail around October 20, 2007.

11         Plaintiff's (and the other transitional carriers') immediate supervisors at the Alameda

12  Post Office were Customer Service Supervisors Veronica Peters and Irene Mosquera.

13  Neither Ms. Peters nor Ms. Mosquera had met any of these employees until they reported

14  to the Alameda Post Office after completing their training at the Oakland P&DC.

15         As indicated above, the assignments given to the transitional carriers vary

16  depending on the needs of the individual post office.  On a typical day at the Alameda Post

17  Office, Ms. Mosquera and Ms. Peters, who also supervised the regular carriers, would

18  "case" the mail (put the mail in sequence of delivery) for the routes to be carried by the

19  transitional carriers.  Plaintiff claims that while Ms. Mosquera and Ms. Peters were casing

20  the mail, he was asked to "help all the female employees load their mail."  Once they had

21  finished casing the mail, Ms. Mosquera and Ms. Peters assigned the transitional carriers to

22  a vacant route, or a portion of a vacant route.

23         The transitional carriers generally left for their deliveries between 9:30 a.m. and

24  10:30 a.m..  While the transitional carriers were out on their routes, Ms. Mosquera and Ms.

25  Peters kept in touch with them by cell phone, to ensure that they were on schedule.  Ms.

26  Mosquera and Ms. Peters expected the carriers to call in around 1:00 p.m. to advise of

27  _____

28         [2]  Mr. Bartolome started on October 1, 2007, but the Postal Service offered him the position on September 10, 2007.

their progress, and they were also to call Ms. Mosquera or Ms. Peters if they needed help

finishing their deliveries.  At some point between 2:00 p.m. and 3:00 p.m., Ms. Mosquera

and Ms. Peters would begin calling the transitional carriers to check on their progress if the

carriers had not yet called in with an update, to see if the carriers expected to complete

their deliveries on time, and to see if they needed any extra help.

Ms. Mosquera and Ms. Peters were not always able to send out an additional carrier

if one of the transitional carriers requested help.  Because the regular carriers at the

Alameda Post Office generally finish work between 3:00 p.m. and 4:00 p.m., the later a

request for help was made, the more difficult it was to find someone to send.

The Alameda Post Office is within the Bay Valley District ("District Office").  The

District Office establishes the mail delivery routes and estimates the number of hours

required to deliver each route.  In 2007, all of the mail delivery routes for the Alameda Post

Office were estimated to take between 5 and 5.5 hours to complete.  The carriers were

instructed to return from their deliveries no later than 6:00 p.m.  The Alameda Post Office

implemented this policy to comply with a directive from the District Office to reduce

overtime costs, as well as to ensure carrier safety and the happiness of Postal Service

customers.

When plaintiff first started delivering mail, he was generally assigned a portion of a

route.  According to Ms. Mosquera, plaintiff was assigned to Route 6 on seven occasions –

October 1, 2, 3, 4, 5, 9, and 22, 2007.  He was not assigned to carry the entire route, as

Ms. Mosquera and Ms. Peters reduced the route by approximately one to two hours' worth

of deliveries.  On October 1, plaintiff returned from his deliveries at 6:15 p.m.  On October

2, he returned at approximately 6:11 p.m.  On October 3, he returned sometime between

6:02 and 6:30 p.m.  Although plaintiff was provided assistance on each of those days, he

took more than 5.5 hours on each of those days to complete his deliveries.

After this series of late returns to the station, Ms. Mosquera had a discussion with

plaintiff on October 4, 2007, about his performance.  During that discussion, Ms. Mosquera

told plaintiff that his performance was unsatisfactory because while he had been given

**United States District Court**
For the Northern District of California

1   assistance on the route, he still had worked past 6:00 p.m. on each of the three days.  She

2   advised plaintiff that he needed to work on his efficiency and speed.

3       On the afternoon of October 4, 2007, Ms. Mosquera went out to observe plaintiff

4   while he was making his deliveries.  She wanted to determine whether there was a

5   particular task he was having trouble with.  She noted that he was not "fingering" the mail –

6   grouping the envelopes together for the next mailbox – as he walked.  Rather, he stood in

7   front of each mailbox while he sorted the mail.  She suggested to plaintiff that his efficiency

8   could be improved if he would "finger" the mail while he walked.

9       Ms. Mosquera states that while plaintiff did return from his deliveries on October 4

10   and 5, 2007, before 6:00 p.m., it still took him longer than the recommended 5.5 hours to

11   complete his deliveries.  Moreover, she asserts, when he was assigned to Route 6 on

12   October 9 and 22, 2007, he did not return to the station until 6:43 and 6:44, respectively.

13       Ms. Mosquera went out to observe plaintiff on his route on October 12, 2007, when

14   he was assigned to Route 9.  Again, she observed that plaintiff was not working efficiently.

15   The Postal Service trains city carriers to park their vehicles and then take mail with them,

16   so that they can walk a loop, with their first and last deliveries next to the vehicle.  Ms.

17   Mosquera noticed that plaintiff parked too far from his route, and also observed that he did

18   not bring the amount of mail that would bring him back to his vehicle at the conclusion of

19   his deliveries.

20       That same day, Ms. Mosquera and Ms. Peters discussed plaintiff's performance.

21   Ms. Peters expressed to Ms. Mosquera her concerns that plaintiff took longer than

22   expected to finish his assigned deliveries.  Also, she noted that based on the amount of

23   time it took plaintiff to complete a portion of a delivery route, it would not be possible for him

24   to complete a full route.

25       Ms. Peters states that probationary employees are evaluated three times – at 30-

26   day intervals – during their probationary period.  On October 12, 2007, after meeting with

27   Ms. Peters, Ms. Mosquera met with plaintiff and gave him his 30-day performance

28   evaluation.  Ms. Mosquera states in her declaration that she completed the evaluation with

input from Ms. Peters.

She states that she and Ms. Peters were both concerned about the amount of time it was taking plaintiff to complete a portion of a delivery route, and the fact that plaintiff was not able to timely complete a full route. Although plaintiff received "satisfactory" ratings on his 30-day evaluation in the categories of work relations, work methods, and personal conduct, he was rated "unacceptable" in the categories of work quantity, work quality, and dependability because he did not complete his assignments in a timely manner, and did not work at a sufficient speed to keep up with the amount of work required.

At the October 12, 2007 meeting, Ms. Mosquera told plaintiff that he needed to complete his deliveries faster,[3] and explained to him that if he did not improve, he could be terminated. Plaintiff concedes that Ms. Mosquera told him that he needed to improve his performance, and he admits that he "perhaps" needed to improve his performance, but he also claims that he "didn't know what his mistakes were." However, it is undisputed that plaintiff did not ask Ms. Mosquera (or anyone at the Alameda Post Office) how he could improve, and that he did not make any changes in his performance after the October 12, 2007 discussion with Ms. Mosquera. In his deposition, plaintiff asserted, "I was not doing anything wrong . . . All I knew I was working; I was doing my work well." He also claimed to be unable to recall most of the discussion with Ms. Mosquera.

Following this meeting, neither Ms. Mosquera nor Ms. Peters noticed any improvement in plaintiff's performance. On October 22, 2007, during one of the regular meetings Ms. Mosquera and Ms. Peters had with Ray Davis, Postmaster of the Alameda Post Office, they discussed the possibility of terminating plaintiff with Mr. Davis and William Coleman (another supervisor at the Alameda Post Office). Mr. Davis agreed that

---

[3] At one point in his deposition, plaintiff testified that Ms. Mosquera also told him on October 12, 2007 that it was District policy that carriers could not come in from their deliveries after 6:00 p.m. because that would incur overtime. At another point, he testified that no one ever told him that the city carriers needed to finish deliveries by 6:00 p.m. Later, he testified that he couldn't remember whether anyone had ever told him that he had to return from the deliveries by a particular time, and also claimed that he was unaware that there was any set time by which the deliveries were supposed to be finished.

United States District Court

For the Northern District of California

1    termination was the best course.  Ms. Peters consulted with the Postal Service's Labor and

2    Employee Relations Office, and drafted a notice of separation, with input from Ms.

3    Mosquera.  Ms. Mosquera reviewed the final letter and approved it.

4        The notice of separation was given to Mr. Coleman to deliver to plaintiff on October

5    26, 2007.  The notice advised plaintiff that he was being terminated from the Postal Service

6    "for failure to meet requirements of your position and also your poor work performance

7    during [your] probationary period."

8        The notice, which was signed by Ms. Mosquera, referenced the 30-day evaluation,

9    which Ms. Mosquera had given plaintiff on October 12, 2007.  The notice stated that Ms.

10   Mosquera had given plaintiff her "set of expectations" at that time, and had told him that he

11   needed to improve his performance, and that up to the date of the notice, plaintiff "cannot

12   carry a full route."

13       The notice also referred to Ms. Mosquera's October 4, 2007 discussion with plaintiff

14   about his late returns to the station when he was assigned to Route 6, and her

15   observations on that day that plaintiff had failed to "finger" the mail and was also parking

16   too far away from the area in which he was delivering.

17       Of the four other transitional carriers who began working at the Alameda Post Office

18   at around the same time as plaintiff, Mr. Tong was terminated (also on October 26, 2007)

19   for performance and attitude issues; Ms. Pak has received satisfactory or outstanding

20   ratings and still works at the Alameda Post Office (and carries a full route); Mr. Bartolome's

21   employment terminated at the end of a term in September 2009, because the number of

22   delivery routes had decreased; and Ms. Zapanta-Mato resigned for medical reasons on

23   January 8, 2008.

24       Ms. Peters states that she completed Ms. Pak's 30-day, 60-day, and 90-day

25   performance evaluation reports during Ms. Pak's probationary period, and that Ms. Pak

26   was rated as either satisfactory or outstanding throughout.  According to Ms. Peters, within

27   approximately one week from the time she started delivering mail, Ms. Pak was able to

28   carry a full route.

1    Moreover, Ms. Pak could complete a full route quickly enough that Ms. Peters and

2    Ms. Mosquera could give her a second assignment of a portion of another route.  Ms.

3    Peters asserts that Ms. Pak consistently worked faster than plaintiff, completed more

4    deliveries in a day, and could be depended upon to carry a heavier workload than plaintiff.

5    Ms. Peters also states that Mr. Bartolome was able to carry a full route within a couple of

6    weeks from when he first started delivering mail.

7    Plaintiff filed an EEO administrative charge on December 26, 2007, asserting that he

8    had been unlawfully terminated because of his age and gender, and that the alleged act(s)

9    of discrimination had occurred on October 26, 2007.  He also stated that he "felt harassed

10    by my Supervisors, Ms. Peters and Ms. Mosquera, from the day I started as a mail carrier."

11    He claimed that he "was out by 12 noon to deliver mail," and that while he was delivering

12    mail, "Ms. Peters and/or Ms. Mosquera would call me on my cell phone, every 10 to 15

13    minutes, telling me to 'hurry up,' 'why are you too slow?'"

14    He added that he received the "separation paper" on October 26, 2007, and that he

15    "found out later that, out of three (3) carriers hired on the same day, two of us (both male

16    and over 40 yrs. old) were let go and the other carrier, Ms. Savannah Pak (a young

17    woman) was kept."  He added that Ms. Pak had "told me she received outstanding

18    performance review even though I have been helping her finished [sic] her route."  He

19    stated that the remedy he was seeking was to be "reinstated" into a "regular carrier"

20    position, with back pay.  He also wanted Ms. Peters and Ms. Mosquera to be either

21    "remov[ed]" or "transfer[red]."

22    The EEO administrative law judge issued a decision on November 3, 2008, finding

23    that plaintiff had failed to establish his discrimination or harassment claims.  The EEO filed

24    its notice of final action on November 6, 2008.  Plaintiff did not appeal the notice of final

25    action, and instead opted to file a civil action.

26    Plaintiff filed the complaint in the present action on February 6, 2009, alleging

27    unlawful termination on the basis of age and gender, and also alleging harassment on the

28    basis of age (and possibly gender).  In the "facts surrounding the claim" section, he states

as follows:

> I'm Edgardo Loyola, male, date of birth 1953, they said I was working at past 6 p.m. every day while working as a Mail Carrier at Alameda Post Office but they allowed Savannah Pak, Female, Date of Birth 1985, and Adoracion Zapantamato (attached her statement)[4] working late till 8 p.m. every day and I was replaced by Mark Bartolome 30 years old and younger than me, while I helped them to finish their route.

Defendant now seeks summary judgment.  Defendant filed the motion on January 13, 2010, in accordance with the deadline set in the case management and pretrial order, and noticed the motion for hearing on February 17, 2010.[5]  Plaintiff's opposition to the motion was due on January 27, 2010.  On January 22, 2010, plaintiff filed a document entitled "Motion to Subpoena the Original Transcript Record of My Deposition," and another document entitled "Motion to Review Documents on this Case."

In the "Motion to Subpoena the Original Transcript" (which was denied on February 8, 2010, on the ground that plaintiff had not noticed the deposition and was not entitled to the original transcript) plaintiff asserted that there were errors in the excerpts of his deposition transcript included with defendant's moving papers.

The "Motion to Review Documents" appeared to the court to be an opposition to defendant's motion for summary judgment, as it repeated plaintiff's main allegations, and also included seven exhibits (unidentified and unauthenticated).  Plaintiff filed no other documents by the opposition due date (January 27, 2010).  Defendant also interpreted the "Motion to Review Documents" as the opposition, and filed a reply brief on February 3, 2010, along with a complete certified copy of the transcript of plaintiff's deposition, asserting that it was a true and correct copy as received from the reporter.

---

[4]  The attached statement by Ms. Zapanta-Mato is dated October 24, 2008, and reads,

Edgardo Loyola was a big help for me during my first week and every time I need assistance on delivery on my Route as a Letter carrier at Alameda Post Office, he works hard and fast and very helpful to all Female Carriers.  I was a TE Carrier working everyday @ Alameda Post Office 9:30 a.m. to longer hours of 6:30 p.m. to 8 p.m. authorized by Management Officials Irene Mosquera and Veronica Peters, Supervisor Customer Service Alameda Post Office.

[5]  No dates have been set for the pretrial conference or the trial.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   On February 16, 2010, the court continued the hearing on defendant's motion to

2   April 7, 2010.  On March 12, 2010, a little less than four weeks before the new hearing

3   date, plaintiff filed a document entitled "Opposition to Defendant's Motion for Summary

4   Judgment," to which he attached 12 exhibits (also unidentified and unauthenticated).

5   Plaintiff again asserted that some of the testimony he is reported as having given

6   "do[es] not make sense because I was never asked any of these questions."  He again

7   requested that he be provided with the original transcript of his deposition, so he could

8   "compare" it with the excerpts provided by defendant, claiming that he was "concerned that

9   there are other important facts that are incorrect in Defendant's version of the transcript."

10   On March 24, 2010, two weeks before the new hearing date, defendant filed a

11   second reply brief, responding to plaintiff's late-filed opposition.  Also with the second reply,

12   defendant lodged the sealed original of the reporter's transcript of plaintiff's deposition.

13   On March 29, 2010, plaintiff filed a document entitled "Loyola, Plaintiff Motion for

14   Summary Judgment," which (apart from the title on the caption) is identical to his March 12,

15   2010 "Opposition to Defendant's Motion for Summary Judgment" (including the unidentified

16   and unauthenticated exhibits).

17   Following the hearing on defendant's motion for summary judgment on April 7, 2010,

18   the court permitted plaintiff an hour to review the original of the deposition transcript in the

19   courtroom, so that he could identify the portions of the certified copy of the transcript that

20   he believed did not match the original.  The court instructed plaintiff to submit a statement

21   of any differences between the certified copy and the original, and advised that it would

22   review those portions of the transcript and make a determination.

23   On April 16, 2010, plaintiff filed a document entitled "Proposed of Plaintiff Motion for

24   Summary Judgment," in which he asserts (without citation to evidence) that he meets the

25   elements of the prima facie case of age discrimination, and claims that "there is a 'genuine

26   issue of fact.'"

27   On April 21, 2010, plaintiff filed a document entitled "Discovery of Discrepancy of the

28   Original Transcript and Certified Copy."  In that document, plaintiff asserts, first, that the

United States District Court

For the Northern District of California

1   original includes a "sealed" stamp from the reporter, while the certified copy does not;

2   second, that the certified copy has a mark of three holes on the left side of page 1, but not

3   on pages 2 through 187; third, that there are parentheses around the area code of the

4   reporter's phone number shown at the bottom of page 1 of the certified copy, but that there

5   are no parentheses around the area code on pages 2 through 187; and fourth, that the

6   original transcript has plaintiff's signature, but the certified copy does not.  In addition, he

7   claims that his answers to two questions were inaccurately reported.

8         Also on April 21, 2010, defendant filed a motion to strike the motion for summary

9   judgment filed by plaintiff on March 29, 2010, on the ground that it was filed after the

10   deadline set by the court (in the case management and pretrial order) for filing dispositive

11   motions.

12         On May 3, 2010, defendant responded to plaintiff's "Discovery of Discrepancy,"

13   noting that plaintiff does not dispute that he reviewed and signed the original transcript on

14   October 26, 2009, and that at that time, he made spelling corrections to the transcript, but

15   no substantive changes.  Defendant argues that the court should reject any attempt by

16   plaintiff to undo the testimony he previously provided under oath on September 21, 2009.

17   Defendant also contends that comparison of the certified copy with the original transcript

18   will demonstrate that the certified copy is an accurate copy of the deposition testimony.

**DISCUSSION**

20   A.    Legal Standard

21         Summary judgment is appropriate when there is no genuine issue as to material

22   facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

23   Material facts are those that might affect the outcome of the case.  Anderson v. Liberty

24   Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

25   is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

26         A party seeking summary judgment bears the initial burden of informing the court of

27   the basis for its motion, and of identifying those portions of the pleadings and discovery

28   responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

United States District Court

For the Northern District of California

v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  Southern Calif. Gas. Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 324-25.  If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion.  See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

B.      Defendant's Motion

1.      Discrimination Claims

Defendant argues that summary judgment must be granted as to the Title VII and ADEA discrimination claims, asserting that plaintiff cannot establish a prima facie case of discrimination because he cannot show that he was performing his job satisfactorily or that he was replaced by a younger transitional carrier.  In addition, defendant contends that the Postal Service had a legitimate, nondiscriminatory reason for terminating plaintiff, and that plaintiff has no evidence sufficient to raise a triable issue as to pretext.

In order to succeed on his discrimination claim, plaintiff must provide evidence showing that the Postal Service intended to discriminate against him.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  In a disparate treatment case, the court applies the analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

In the summary judgment context, the plaintiff bears the initial burden of establishing a prima facie case of disparate treatment.  Chuang v. Univ. of Cal. Davis, Bd. of Trustees, 225 F.3d 1115, 1123 (9th Cir. 2000).  If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its employment decision.  Id. at 1123-24.  Should the defendant carry its

United States District Court

For the Northern District of California

1   burden, the burden then shifts back to the plaintiff to raise a triable issue of fact that the

2   defendant's proffered reason was a pretext for unlawful discrimination. Id. at 1124.

3       In a discriminatory termination claim, the McDonnell Douglas framework requires the

4   plaintiff to establish a prima facie case by showing that he belongs to a class of persons

5   protected by Title VII, that he was performing his job satisfactorily, that he suffered an

6   adverse employment action, and that similarly situated persons outside his protected class

7   were treated more favorably than he was. Leong v. Potter, 347 F.3d 1117, 1124 (9th Cir.

8   2003).

9       To make out a prima facie case of age discrimination under the ADEA in the context

10  of employment termination, a plaintiff must show that he was more than 40 years of age at

11  the time of the challenged employment action; that he was satisfactorily performing his

12  employment responsibilities; that he was discharged from employment; and that a

13  substantially younger employee with equal or inferior qualifications was chosen for the

14  position. Coleman v. Quaker Oats Co., 232 F.3d 1271, 1281 (9th Cir. 2000); Pejic v.

15  Hughes Helicopters, Inc., 840 F.2d 667, 672 (9th Cir. 1988).  Alternatively, as part of the

16  last element, the plaintiff can provide evidence showing that some other circumstance

17  suggests a discriminatory motive. See McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1122

18  (9th Cir. 2004).

19      Here, defendant argues that plaintiff cannot establish a prima facie case of

20  discrimination.  Defendant does not dispute that plaintiff belongs to a class of persons

21  protected by Title VII and the ADEA, or that plaintiff's discharge from employment

22  constitutes an adverse employment action; but argues that plaintiff cannot show that he

23  was performing his job satisfactorily, or that he was replaced by a similarly situated person

24  outside his protected class.

25      First, defendant contends that the evidence it has provided – the declarations of Ms.

26  Mosquera and Ms. Peters, plus the 30-day evaluation and the notice of termination –

27  establish that plaintiff was not performing the duties of his job satisfactorily.  For example,

28  defendant notes, even though plaintiff was assigned to the same route (Route 6) at least

**United States District Court**
For the Northern District of California

seven times, he returned late (after 6:00 p.m.) on five of those occasions.  In 2007, all routes in Alameda were set up so that they would take between 5 and 5.5 hours to complete.  Nevertheless, even though plaintiff's supervisors reduced Route 6 by approximately 1 to 2 hours' worth of deliveries, he still took more than 5.5 hours each time for the reduced route.

Defendant argues further that the evidence shows that plaintiff was not working efficiently, as Ms. Mosquera's observation showed that he was not "fingering" the mail as he walked, but rather stopped in front of each mailbox to sort the mail.  Also, he parked his vehicle too far from his route.  At the time of his termination, more than one month after he had started delivering mail, he still could not carry a full route.

Defendant contends that there is no dispute that plaintiff was repeatedly warned that he was working too slowly, and that he was not working efficiently, and that there is also no dispute that he received "unacceptable" ratings for work quantity, work quality, and dependability on his 30-day evaluation, and that he nonetheless did not improve in performance.

Plaintiff does not provide evidence sufficient to refute defendant's showing.  He asserts in his opposition that he was performing his job satisfactorily, by helping all the "female carriers" and by finishing his mail delivery on time.  He seems to be arguing that the negative performance evaluations and his discharge from employment were motivated by discriminatory animus, rather than by his failure to perform his job as required.  However, he provides no evidence of any such discriminatory animus.

In his deposition, plaintiff claimed that he worked an entire route, and that on many occasions, after he had completed his assignment, Ms. Mosquera and Ms. Peters instructed him to assist his co-workers, including Ms. Pak, Mr. Tong, Ms. Zapanta-Mato, Mr. Bartolome, and "all the regular lady carriers."  However, other than these assertions in his deposition, plaintiff provides no evidence to counter defendant's evidence showing that he was never able to complete a full route.  Nor does he establish that he had any personal knowledge regarding what constituted a "full route."  The fact that on occasion he

United States District Court

For the Northern District of California

completed an assigned route (which, as Ms. Mosquera indicated in her declaration, was only a portion of a "full route") does not mean that he was performing his job satisfactorily.

Plaintiff also testified that he rarely requested help finishing his assignment, and could recall requesting help on only two or three occasions. According to plaintiff, on two of those occasions (both times were during the first week he was delivering mail), he received help from a regular carrier, and on the third occasion, Ms. Mosquera said "no." He testified that he needed help because it was about 5:00 p.m. and it was getting dark. He couldn't remember whether there were any other occasions when he asked for help.

Plaintiff's main method of responding to defendant's motion is to claim that Ms. Mosquera and Ms. Peters consistently lied about him. For example, plaintiff denies that Ms. Mosquera accompanied him to observe him on his route on October 4, 2007, and also claims that Ms. Mosquera never discussed her expectations regarding his performance at the time she gave him the October 12, 2007 evaluation. Nevertheless, these arguments are not supported by any evidence sufficient to create a triable issue as to whether he was performing his job in a satisfactory manner.

Plaintiff also claims that the fact that he "helped" the younger employees with their routes, and the fact that those employees returned after 6:00 p.m., shows that those younger employees were also not performing their jobs in a satisfactory manner. As defendant points out, however, plaintiff admitted in his deposition that he had no personal knowledge regarding what assignments the other employees received, or whether, when they returned after 6:00 p.m., they were actually arriving back after their second route assignment of the day (having already completed another one). Moreover, it is irrelevant whether or not plaintiff "helped" any of the other employees, as that has no bearing on whether plaintiff was able to complete a single route in the assigned time.[6]

---

[6] Plaintiff also claims that the younger employees were allowed to work overtime, while he was not, and appears to be attempting to allege this failure to provide overtime as another "adverse action." However, he did not allege failure to provide overtime as an adverse action in his EEO complaint, and the EEO therefore did not investigate this claim or address it in its written decision. Moreover, defendant has provided evidence in the form of employee time records showing that plaintiff was in fact compensated for overtime.

United States District Court

For the Northern District of California

1    Second, defendant argues that there is no evidence that plaintiff was replaced by a

2    substantially younger employee.  Plaintiff claims that he was replaced by Mark Bartolome,

3    who was 38 years old at the time, but defendant contends that the evidence (Mosquera

4    and Peters declarations) shows that Mr. Bartolome was hired after plaintiff was hired, but

5    before plaintiff was terminated.  Thus, defendant asserts, Mr. Bartolome could not have

6    "replaced" plaintiff after plaintiff was terminated.  Defendant also argues that plaintiff has

7    provided no evidence showing that his duties were transferred to Mr. Bartolome after the

8    October 26, 2007 termination

9    After the hearing on defendant's motion, plaintiff filed a declaration from Mr.

10    Bartolome, who stated that he worked with plaintiff at the Alameda Post Office, and that

11    "[a]fter Edgardo Loyola's employment @ Alameda Southshore Post Office, I did the Route

12    and Job he has done as a T.E. mail carrier."  Nevertheless, in light of the fact that Mr.

13    Bartolome was hired as a transitional city carrier after plaintiff was hired into the same

14    position, and the fact that Mr. Bartolome was still employed as a transitional city carrier at

15    the time that plaintiff was terminated, plaintiff's claim that he was "replaced by" Mr.

16    Bartolome is unpersuasive.  As for the claim of gender discrimination, plaintiff provides no

17    evidence that he was replaced by a similarly-situated female employee.

18    Thus, even if plaintiff's unsubstantiated claim that Ms. Mosquera and Ms. Peters lied

19    about his performance were sufficient to create a triable issue, he still would not be able to

20    establish a prima facie case because he has not shown that he was replaced by a similarly-

21    situated younger or female employee.

22    Accordingly, the court finds that plaintiff has failed to establish a prima facie case of

23    either gender discrimination or age discrimination.  Assuming for the sake of argument,

24    however, that triable issues remain regarding the elements of the prima facie case, the

25    burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason

26    for plaintiff's termination.  McDonnell Douglas, 411 U.S. at 802.  To meet this burden, "the

27    defendant must clearly set forth, through the introduction of admissible evidence," reasons

28    for its employment decision which, if believed by the trier of fact, would support a finding

1  that the employment action was not a result of unlawful discrimination.  Burdine, 450 U.S.

2  at  255.

3       Here, defendant contends that it had a legitimate, non-discriminatory reason for

4  terminating plaintiff – his unsatisfactory job performance and his failure to improve during

5  his probationary period.  An employee's unsatisfactory work performance is a legitimate,

6  non-discriminatory reason for terminating an employee.  See Aragon v. Republic Silver

7  State Disposal, Inc., 292 F.3d 654, 661 (9th Cir. 2002).  The district court should not

8  substitute its own judgment about whether an employment decision was "wise" or "fair" for

9  the judgment of the employer.  Odina v. Westin Tucson Hotel Co., 991 F.2d 595, 602 (9th

10  Cir. 1993).

11       Defendant notes that plaintiff admitted in his deposition that Ms. Mosquera and Ms.

12  Peters called him frequently to tell him that he was working too slowly, and that he was told

13  at least twice that his performance was unsatisfactory.  He also conceded that despite

14  being told repeatedly that he was not performing is job quickly enough, he did not improve,

15  or even ask how he could improve.

16       Once the employer has satisfied its burden of articulating a nondiscriminatory reason

17  for its decision to terminate the plaintiff, the presumption of unlawful discrimination "simply

18  drops out of the picture."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).  The

19  plaintiff then must introduce sufficient evidence to raise a genuine issue of material fact as

20  to whether the employer's proffered nondiscriminatory reason is merely a pretext for

21  discrimination.  Coleman, 232 F.3d at 1282; see McDonnell Douglas, 411 U.S. at 804.

22       To survive summary judgment, the plaintiff must produce enough evidence to allow

23  a reasonable factfinder to conclude either that the employer's proffered explanation is

24  "unworthy of credence" because it is internally inconsistent or otherwise not believable, or

25  that unlawful discrimination more likely motivated the employer.  Chuang, 225 F.3d at 1127;

26  see Burdine, 450 U.S. at 256.

27       Here, plaintiff argues that defendant's articulated reason is pretextual, and that the

28  real reason for his termination was either that he was older and male, or (not entirely clear)

17

United States District Court

For the Northern District of California

"some other reason" – such as that Ms. Mosquera did not like the fact that he was talking to a female clerk, Teresita Nieto, who was a friend of Ms. Mosquera's.

Plaintiff also seems to be arguing that the explanations provided by defendants as to why he was slow in delivering the mail (which he denies, in any event) were fabricated. With regard to the claim that he was not "fingering" the mail as he walked from house to house, plaintiff asserts that he was never taught to "finger" the mail during his training period.  With regard to the claim that he was not parking close enough to his delivery "loop," plaintiff asserts that Ms. Mosquera gave two different dates for when this supposedly occurred.  With regard to the argument that he was repeatedly warned that his performance was not satisfactory, he claims (without support) that Ms. Mosquera and Ms. Peters are lying in their declarations.

Nevertheless, plaintiff conceded most of these things in his deposition.  His response to that, however, is to claim that the deposition transcript has been altered. Specifically, he claims that some of his answers to questions in his deposition are fabricated, asserting that he "was never asked any of these questions."  As indicated above, however, plaintiff reviewed the deposition transcript on October 26, 2009, approximately five weeks after the deposition was taken, and did not at that time make any substantive corrections to the transcript.  As the court finds that the certified copy that was provided to plaintiff by the government is an accurate copy of the original transcript, plaintiff's argument that the transcript does not accurately reflect his testimony is without merit.

Plaintiff has provided no other evidence sufficient to show a discriminatory motive in his termination.  He testified that he could not recall any time that Ms. Mosquera or Ms. Peters said anything to him about his age or gender.  He suggests that the reasons given for his termination are pretextual because Ms. Pak received "outstanding" ratings on her evaluations, even though plaintiff "helped" her; because Ms. Pak and Ms. Zapanta-Mato were permitted to work overtime until 9:00 while plaintiff was not; and because the Postal Service hired Mr. Bartolome after it hired plaintiff.  However, these claims are not supported

18

1    by evidence.

2         At most, the evidence (plaintiff's testimony) shows that there were times when

3    plaintiff's supervisors instructed him to assist Ms. Pak; or that there may have been days

4    when plaintiff finished his assigned (partial route) delivery in sufficient time to assist some

5    of his co-workers.  Even if true, this testimony does not show that plaintiff worked with

6    sufficient speed to carry a full route, much less demonstrate that plaintiff was adequately

7    performing his job or that Ms. Pak's performance ratings were unwarranted.  Plaintiff has

8    provided no evidence showing that he out-performed Ms. Pak, and the evidence actually

9    shows that Ms. Pak out-performed plaintiff.

10        The court finds that defendant's motion for summary judgment must be GRANTED

11   and that plaintiff's motion must be DENIED.  As for the merits of his claim, plaintiff cannot

12   establish a prima facie case of discrimination, as he has no evidence that he was replaced

13   by a younger employee or by a female employee, and has no other evidence suggesting

14   that he was terminated because of his age or gender.  In addition, he has not provided

15   evidence sufficient to raise a triable issue as to pretext.

16        Plaintiff's claim that his deposition testimony has been misrepresented is not

17   sufficient to create a triable issue, as he cannot now deny that he made the statements he

18   is reported as having made during the deposition.  Moreover, as defendant notes, the

19   statements in the deposition agree with plaintiff's prior testimony during the EEO

20   investigation.

21        2.    Harassment Claim

22        Plaintiff's claim of harassment is based on the telephone calls he received from his

23   supervisors regarding his progress on his deliveries.  Defendant contends that summary

24   judgment must be granted because the conduct about which plaintiff complains was not

25   severe or pervasive, and because plaintiff has no evidence that the alleged conduct was on

26   account of plaintiff's age (or gender).

27        A hostile work environment claim involves "a workplace atmosphere that is so

28   discriminatory and abusive that it unreasonably interferes with the job performance of those

19

**United States District Court**
For the Northern District of California

1   harassed." <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 923 (9th Cir. 2000).  The working

2   environment must be both subjectively and objectively perceived as abusive.  <u>Id.</u>  Whether

3   the workplace is objectively hostile must be determined from the perspective of a

4   reasonable person with the same fundamental characteristics as the plaintiff, and must be

5   based on the totality of the circumstances.  <u>See</u> <u>Ellison v. Brady</u>, 924 F.2d 872, 879 (9th

6   Cir. 1991).  "Ordinary tribulations in the workplace" do no constitute harassment.  <u>Faragher</u>

7   <u>v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998).

8           Defendant argues that the conduct about which plaintiff complains does not rise to

9   the level of harassment or hostile work environment as a matter of law.  Defendant asserts

10  that criticisms of plaintiff's work, even if viewed by plaintiff as frustrating or inefficient

11  (because it interfered with his work) do not suffice to establish that plaintiff was subjected to

12  treatment that a reasonable person would find offensive.  Defendant notes that Ms.

13  Mosquera and Ms. Peters have explained in their declarations that they had a duty to

14  supervise the carriers and to ensure that they were performing their jobs satisfactorily

15  (which included making sure that the mail was delivered in a timely manner), and that one

16  of the ways they supervised the probationary carriers was to keep in contact with them by

17  phone.

18          Defendant argues that the fact that plaintiff required frequent correction because of

19  the slowness of his deliveries does not mean that his supervisors' criticisms can be viewed

20  as objectively abusive.  Defendant notes that plaintiff has provided no evidence of any

21  profanity or offensive utterances against him, or any threatening or crude behavior, or any

22  conduct causing him humiliation.  In particular, there is no evidence of any harassment

23  based on either his age or his gender.[7]  Rather, he complains only that his supervisors

24  called him frequently on his cell phone to tell him to work more quickly.  Defendant

25  contends that summary judgment must be granted as to this claim because plaintiff has no

26

27          [7]  When asked at his deposition whether either Ms. Mosquera or Ms. Peters had ever

28  said anything to him about his age or his gender, he responded (as he did to many, many other
    questions), "I don't remember."

United States District Court

For the Northern District of California

1    evidence of any objectively abusive conduct directed toward him.

2         In his opposition, plaintiff does not respond to any of defendant's arguments.  He

3    simply repeats the assertion that his supervisors called him frequently, and that the conduct

4    was "severe and/or pervasive."  Plaintiff claims that starting around September 20 or 21,

5    2007 (the date he first started delivering mail in Alameda), Ms. Mosquera and Ms. Peters

6    frequently called him on his cell phone while he was out making deliveries.  He testified in

7    his deposition that he could not recall why Ms. Mosquera called him, and suggested that it

8    was "maybe because I call her and she's returning my call."

9         Plaintiff also testified, however, that when Ms. Peters called him, she asked

10   questions like "how come it will take you [sic] to finish your route" and "how come you're too

11   slow" and "how much longer will it take for you to finish that route," and that she would

12   constantly say "hurry up, why are you so slow."  He conceded that he believed that Ms.

13   Mosquera and Ms. Peters called him because they wanted him to work faster.

14        Plaintiff testified further that some of the calls he received from Ms. Mosquera and

15   Ms. Peters showed up on his phone as from an "unavailable" number, but he did not know

16   whether all the calls attributable to "unavailable" numbers originated with Ms. Mosquera

17   and Ms. Peters, and could not identify which of the calls from "unavailable" numbers on his

18   phone records were calls from Ms. Mosquera and Ms. Peters.

19        Plaintiff's cell phone records show, from September 21, 2007, to October 26, 2007,

20   during the hours plaintiff was working, 19 calls from Ms. Peters' number, and 44 calls from

21   an "unavailable" number.  In addition, plaintiff's phone records for the same period show

22   that plaintiff placed 37 calls to Alameda Post Office numbers.[8]

23        With his opposition to the motion, plaintiff submits a declaration dated October 24,

24   2008, from his co-worker Mr. Tong (who was subsequently terminated for, among other

25

26   _____

27        [8]  In his deposition, plaintiff testified that he did not regularly call in to his supervisors
     when he was out on his deliveries, and that no one ever told him he had to call in regularly.
28   He testified that it was his understanding that they would call him, and that he only needed to
     call if he needed help finishing his route (because it was dark and he didn't know the
     addresses – not because there was a particular time that he needed to finish the deliveries).

United States District Court

For the Northern District of California

1   things, removing cash from an envelope, and leaving mail on the steps instead of putting it

2   in the mailboxes) in which Mr. Tong repeats the claim that he and plaintiff "was target of

3   Harassment called on our cell phone while delivering mail on or around September 15,

4   2007 by Management Official [Mosquera and Peters;]" and also asserts that on October 15,

5   2007, he and plaintiff "was told to work later than the time we were scheduled and

6   subsequently denied assistance to finish the route [by Mosquera and Peters.]"

7        The court finds that defendant's motion must be GRANTED and that plaintiff's

8   motion must be DENIED.  Plaintiff cannot establish that he was subjected to harassment or

9   a hostile work environment because of his age or gender.  He bases his entire harassment

10  claim on the fact that his supervisors called him on his cell phone while he was delivering

11  mail, to tell him to work faster, but provides no evidence that the calls were made because

12  of his membership in the protected class.  Indeed, at this deposition, plaintiff answered "I

13  don't know" when asked whether he believed that he received phone calls from either Ms.

14  Mosquera or Ms. Peters because of either his age or his gender.  He also testified that

15  other than the phone calls, there was no other way that Ms. Peters harassed him.  When

16  asked the same question about Ms. Mosquera, he answered, "I don't remember."

17       What the evidence does show is that he was a probationary employee, and it was

18  part of his supervisors' responsibilities  to make sure that he was performing the duties of

19  his job.  Calling him to tell him he needed to work faster was one legitimate way of doing

20  that.  Moreover, his claim that Ms. Mosquera and/or Ms. Peters called him on his cell

21  phone "every 10 to 15 minutes" is not supported by the evidence, as the cell phone records

22  show, at most, three or four calls to plaintiff on any given date.  In addition, there is no

23  evidence whatsoever that the calls were motivated by discriminatory animus.

24       The statement by Mr. Tong is not sufficient to raise a triable issue of fact, as he had

25  no personal knowledge regarding what calls plaintiff received, and even if he had such

26  personal knowledge, his statement does not establish the existence of an objectively

27  abusive work environment.  In addition, if it shows anything, the statement reflects that

28  plaintiff was not singled out for the phone calls – Mr. Tong received them as well.  In

1  addition, plaintiff himself testified in his deposition that he had no knowledge of how often

2  any of the other carriers received calls from Ms. Mosquera and Ms. Peters.

3                                    **CONCLUSION**

4          In accordance with the foregoing, the court finds that defendant's motion for

5  summary judgment must be GRANTED and that plaintiff's motion must be DENIED.  In

6  view of plaintiff's pro se status, and in view of the fact that defendant was granted leave to

7  oppose plaintiff's late-filed motion for summary judgment, the court DENIES defendant's

8  motion to strike plaintiff's motion.

9

10  **IT IS SO ORDERED.**

11  Dated: May 17, 2010

12                                                          PHYLLIS J. HAMILTON
                                                            United States District Judge

**United States District Court**
For the Northern District of California